# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

### NORTHERN DIVISION

| | |
|---|---|
| RAYMOND BOSARGE (AIS: 158686);<br>BRANDON CARTER (AIS 261259);<br>PATRICK CHAREST (AIS: 182262);<br>ROBERT GEORGE (AIS: 176647);<br>CLIFFORD ELLIS (AIS: 208226); JUSTIN<br>HICKS (AIS: 280787); JONATHAN HILL<br>(AIS: 234918); ANTWAN LAMBERT (AIS:<br>279295); ARLANDO NICHOLS (AIS:<br>303975); DEMETRIUS POE (AIS: 279106);<br>WILLIAM ROACHE (AIS: 229754); ERIC<br>THOMAS (AIS: 137013); KENNETH<br>TRAYWICK (AIS: 177252); WILLIE<br>TURNER (AIS: 264598); and RODNEY LEE<br>LINDSAY | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )    NO. _____ |
| UNITED STATES DEPARTMENT OF THE<br>TREASURY; JANET L. YELLEN,<br>SECRETARY OF THE UNITED STATES<br>DEPARTMENT OF THE TREASURY;<br>ALABAMA DEPARTMENT OF<br>CORRECTIONS; ALABAMA<br>CORRECTIONS INSTITUTION FINANCE<br>AUTHORITY; KAY E. IVEY, ACIFA<br>MEMBER & PRESIDENT, GOVERNOR;<br>JOHN Q. HAMM, ACIFA MEMBER & VICE<br>PRESIDENT, COMMISSIONER OF THE<br>ALABAMA DEPARTMENT OF<br>CORRECTIONS; BILL POOLE, ACIFA<br>SECRETARY & MEMBER, STATE<br>DIRECTOR OF FINANCE; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

REPRESENTATIVE STEVE CLOUSE, )
ACIFA MEMBER, CHAIR OF THE HOUSE )
WAYS AND MEANS GENERAL FUND )
COMMITTEE; SENATOR GREG )
ALBRITTON, ACIFA MEMBER, CHAIR OF )
THE SENATE FINANCE AND TAXATION )
GENERAL FUND COMMITTEE; SENATOR )
BOBBY SINGLETON, ACIFA MEMBER, )
JOINT APPOINTEE HOUSE MINORITY )
LEADER AND SENATE MINORITY )
LEADER; CAM WARD, ACIFA MEMBER, )
DIRECTOR OF BUREAU OF PARDONS )
AND PAROLES; YOUNG BOOZER, ACIFA )
NON-MEMBER TREASURER, )
TREASURER OF THE STATE OF )
ALABAMA; CADDELL CONSTRUCTION )
CO. (DE), LLC; and W.S. NEWELL & SONS, )
INC. )
)
     Defendants. )
)
_____ )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

     Plaintiffs, by and through its undersigned counsel of record, file this Complaint, arising out of the proposed construction of two Alabama men's prison facilities financed in part by $400 million in federal funds under the Coronavirus State and Local Fiscal Recovery Funds ("SLFRF") program of American Rescue Plan Act ("ARPA") – funds intended to support states' response to and recovery from the COVID-19 public health emergency. Pursuant to Local Rule 7.1, Plaintiffs' Disclosure Statement is attached hereto as Exhibit 1.

## INTRODUCTION

1.     This action challenges violations of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*, in connection with Defendants' decision to

authorize, fund, or otherwise advance construction of two men's correctional facilities, (i) a men's correctional facility in Elmore County, Alabama, on certain real property owned or to be owned by Alabama Corrections Institution Finance Authority ("ACIFA") and consisting of buildings and improvements designed to house approximately 4,000 male inmates (the "Elmore Men's Prison Facility"); and (ii) a men's correctional facility in Escambia County, Alabama, on certain real property owned or to be owned by ACIFA and consisting of buildings and improvements designed to house approximately 4,000 male inmates (the "Escambia Men's Prison Facility" and together with the Elmore Men's Prison Facility, the "ADOC Men's Prison Facilities").

2.     Defendants Alabama Department of Corrections ("ADOC"), ACIFA and its named Defendant members, Caddell Construction Co. (DE), LLC ("Caddell") and W.S. Newell & Sons, Inc. ("W.S. Newell") violated NEPA, by failing to provide sufficient public notice and an opportunity to comment on the proposed construction project which will be heavily funded by federal dollars before adoption and by failing to meaningfully consider the environmental impacts of the new ADOC Men's Prison Facilities

3.     Defendants United States Department of the Treasury through Defendant Janet Yellen (together, "Treasury") failed to enforce the aforementioned NEPA violation.

*A.     NEPA*

4.     Often referred to as the "Magna Carta of environmental laws," NEPA was enacted in 1970 to protect human health and the environment by ensuring that "unquantified environmental amenities and values" are given "appropriate consideration in decision-making." 42 U.S.C. § 4332(2)(B). These protections, important across the nation, hold heightened significance in the southeastern United States. Home to some of the nation's most significant,

diverse, and valuable natural resources, the Southeast is also one of the fastest growing regions in the country. The tensions epitomized by this region—"the profound impact of man's activity on the interrelations of all components of the natural environment" —led Congress to enact NEPA. 42 U.S.C. § 4331(a).

5.      NEPA does not require particular substantive outcomes, but it does require federal agencies to "take a 'hard look' at the environmental effects of their planned action[s]" before approving them. *Marsh* v. *Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989). "Simply by focusing the agency's attention on the environmental consequences of a proposed project"—by requiring preparation of a "detailed" environmental impact statement before projects that may have significant environmental impacts are approved—"NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson* v. *Methow Valley Citizens*, 490 U.S. 332, 348-49 (1989). At the heart of NEPA's statutory scheme are action-forcing processes intended to ensure that decision-makers take a "hard look" at the impacts of their actions and "use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony." *Id.*

6.      NEPA establishes "a broad national commitment to protecting and promoting environmental quality." *Robertson*, 490 U.S. at 348. It declares the federal government's responsibility to act "as [a] trustee of the environment for succeeding generations" and to use "all practicable means" to "assure . . . safe, healthful, productive, and esthetically and culturally pleasing surroundings," 42 U.S.C. § 4331.

7.      In Section 102 of NEPA, Congress required every federal agency to prepare a "detailed statement by the responsible official," 42 U.S.C. § 4332(2)(C), regarding a

proposed project's environmental impacts, so that agencies will make fully informed and

well-considered choices before resources are committed. *Id*. § 4332(2)(C)(i). Through this

mechanism, Congress intended NEPA to serve as "an environmental full disclosure law" that

enables the public to "weigh a project's benefits against its environmental costs." *Sierra Club* v.

*U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1049 (2d Cir. 1985). Congress also intended NEPA

environmental review to ensure "the integrity of the agency process," forcing agencies to "face"

rather than "ignor[e]" "stubborn, difficult-to-answer objections." *Id*.

       8.     NEPA reviews have served critical environmental justice, environmental

health, and conservation functions. Environmental impact statements have, for example,

identified, and allowed the public and agency decision-makers to address, the harmful

cumulative impacts of new highways or chemical plants in fence-line communities that face

racial and economic inequities, which are often overburdened by multiple sources of pollution.

That pollution frequently includes air contaminants; light, noise, and vibration intrusions; and

exposure to hazardous and toxic chemicals from nearby legacy disposal sites, oil and gas

development, power plants, refineries, incinerators, and manufacturing facilities—all of which

are disproportionately sited in these neighborhoods. Many of these overburdened communities

are also especially vulnerable to sea-level rise, storm surges, heat waves, and elevated urban

temperatures and other impacts of climate change.

       9.     Many of the most overburdened communities have predominantly Black,

Latinx, and Indigenous populations who are socially vulnerable due to poverty and a lack of

access to medical care, transportation, and food. These communities are often defined by years

of discriminatory redlining and systemic racism in industrial development. Black, Latinx, and

Indigenous people in this country live on average with 66% more air pollution than white people.

Relevant to the project that is the subject of this Complaint, these communities are the very ones most impacted by the ill effects of incarceration, both environmental and otherwise.

10.     NEPA reviews have also required disclosure—and, in some cases, avoidance of—the slow but irreversible impacts to our climate of countless separate but contemporaneous projects and approvals. NEPA has, for example, mandated that projects take into account downstream powerplant emissions resulting from pipeline approvals, consider cumulative carbon pollution from relaxed vehicle fuel-efficiency standards, and disclose how fossil fuel extraction from drought-ridden western landscapes will contribute to climate change. As Congress recognized in enacting NEPA, federal agencies cannot make fully informed decisions about the complex, interrelated, and sometimes long-term impacts of projects they enable, unless they consider those impacts.

11.     Countless unnecessary environmental harms—including deadly air pollution in residential communities already overburdened by environmental hazards, the individually small but cumulatively devastating climate change impacts of dirty fuels, and the piecemeal destruction of the habitat of species on the brink of extinction have been identified, disclosed, and often avoided, simply because NEPA requires projects with a federal nexus to go through the process of thinking before acting.

12.     Ultimate responsibility for interpreting and enforcing NEPA falls to the federal courts. *See*, e.g., *Robertson*, 490 U.S. at 355-56; *NRDC* v. *Callaway*, 524 F.2d 79, 86 (2d Cir. 1975); *cf. Fed. Election Comm'n* v. *Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981); *Marbury* v. *Madison*, 5 U.S. 137, 177 (1803).

13.     NEPA reviews have also long played a critical role in encouraging consideration of how creeping development and exploitation of landscapes and ecosystems harm

our shared treasures and public health. By demanding thought before action, NEPA has helped to protect, or at least to provide for more-informed decisions regarding, places from Long Island Sound to the environs of Yosemite. NEPA has improved decisions affecting black bear, cougars, and even neotropical migratory birds (many of which pass through both ADOC Men's Prison Facility locations). The statute has, in Congress's words, guided federal agencies to "fulfill the[ir] responsibilities" to act as "trustee[s] of the environment for succeeding generations." 42 U.S.C. § 4331(b)(1).

**B.**   ***Major Federal Action***

14.     NEPA applies to "major Federal actions significantly affecting the quality of the human environment." 42 USC § 4332(2)(C). "Major Federal action" is defined as "actions with effects that may be major and which are potentially subject to Federal control and responsibility."

15.     On March 11, 2021, President Biden signed ARPA into law. SLFRF, a part of the American Rescue Plan, empowered Defendant Treasury to oversee and monitor the disbursement of $350 billion to state, local, and Tribal governments across the country to support their response to and recovery from the COVID-19 public health emergency.

16.     On October 1, 2021, Defendant Governor Kay Ivey signed into law HB4 and HB5 of the 1st Special Session of 2021, which authorized the use of $400 million (20% of the total ARPA funds Alabama received and approximately 76% of the ARPA funds categorized as covering "lost revenue") of Alabama's $2.1 billion to partially finance the construction of the ADOC Men's Prison Facilities. According to the Design-Build Contract by and between Caddell Construction Co. (DE), LLC ("Caddell") and ACIFA, dated April 15th, 2022, projected costs for construction of the Elmore Men's Prison Facility will be no greater than $623,646,000. The

contract between ACIFA and the contractors selected to build the Escambia Men's Prison

Facility, BL Harbert, has not been released to the public, but ACIFA has indicated a similar

design and cost structure for that facility. Based on these projected costs and the amount of

money allocated by the State of Alabama to construct these prisons, federal funds will account

for approximately 31% of the total cost. Without these federal funds, Alabama would not be able

to construct these prison facilities.

17.     The ADOC Men's Prison Facilities is a major federal action because the

federal funding provided to the State of Alabama that is to be used in the construction of the

ADOC Men's Prison Facilities is essential to its completion – Alabama does not have sufficient

state funds to cover the cost of these facilities on its own. Indeed, the State of Alabama is more

than $200 million short of its projected budgetary needs to finance this prison project because its

bond fundraising fell dramatically and unprecedentedly short of the target. Therefore, the impact

of this federal assistance is more than minimal and constitutes a major Federal action requiring

NEPA review.

18.     Defendant Treasury, as a federal agency, is responsible for ensuring NEPA

compliance in projects over which it exerts sufficient control or responsibility. Defendant

Treasury "will consider environmental quality as equal with economic, social, and other relevant

factors in program development and decision-making processes. Additionally, Treasury will fully

evaluate its actions to ensure compliance with the requirements of NEPA and the CEQ

regulations, where applicable." Treasury Directive Publication (TD P) 75-02(3)(a).

19.     Defendant Treasury issued an Interim Final Rule on May 17 2021,

interpreting eligible uses of SLFRF, and issued a Final Rule on January 6, 2022, governing the

use of SLFRF as established under ARPA. Between the issuance of the Interim Final Rule and

the Final Rule, Defendant ADOC submitted a public comment to Defendant Treasury on July 15, 2021, for consideration in their Final Rule-making process (Comment ID: TREAS-DO-2021-0008-0596). In that public comment, Defendant ADOC stated that "over half of the in-house population are persons of color," that "the typical incarcerated person in the ADOC system comes from a low socio-economic background with limited education," and that during the pandemic "unemployment for the incarcerated persons [in ADOC custody] was 100%." In light of the Interim Final Rule's guidance that disadvantaged populations should be considered in the allocation of ARPA funds, Defendant ADOC indicated that the people in its custody should be considered a disadvantaged and disproportionately impacted group, and that ADOC should be eligible to receive ARPA funds as their custodial agency.

20.     In its public comment, Defendant ADOC requested guidance from Defendant Treasury as to whether corrections infrastructure projects are considered eligible for ARPA funds. In seeking Defendant Treasury's approval of its project, Defendant ADOC admits the power and direct control Defendant Treasury has. This admission further supports the conclusion that the Alabama prison construction, since it is significantly funded through Federal assistance that has stringent conditions attached, is subject to Federal agency oversight and input.

21.     Despite recognizing the need for Federal approval of its project, the State of Alabama did not wait for the Final Rule to be issued before allocating $400 million in ARPA funds toward prison construction during a Special Legislative Session in September and October 2021. When Defendant Treasury issued their Final Rule three months later, the SLFRF Final Rule Overview stated that "construction of new correctional facilities as a response to an increase in rate of crime" and "construction of new congregate facilities to decrease spread of COVID-19 in the facility" are both presumed "generally ineligible" uses of ARPA funds.

22.     Defendant Treasury has repeatedly provided guidance to states about appropriate uses of funds and has been vested with the authority to enforce compliance with its interpretations, thereby exercising control over and responsibility for the projects that are made possible under its guidance and fund disbursement.

23.     The ADOC Men's Prison Facilities are Entirely enabled by federal assistance, and the deployment of that federal assistance is under direct guidance of Defendant Treasury.

24.     For all of the aforementioned reasons, The ADOC Men's Prison Facilities is a major Federal action and therefore subject to Federal enforcement of compliance under NEPA.

*     *     *

25.     Defendants ADOC and ACIFA have been receiving funding, demolishing structures, conducting surveys, clearing land, and doing other site preparation work without having completed the required NEPA studies for this project. Proceeding with site work and construction prior to NEPA review precludes an opportunity to evaluate cumulative and potentially irreversible impacts including disturbance of habitat, new wastewater treatment systems requiring a National Pollutant Discharge Elimination System (NPDES) permit, increased discharges and impacts to already strained waterways, disturbance of cultural resources, and consideration of environmental justice concerns in the surrounding communities.

26.     Defendants' activities are contrary to law, arbitrary and capricious, and constitute an abuse of discretion under § 706(2)(A) of the Administrative Procedure Act ("APA"),. 5 U.S.C. § 551706 (2002). Plaintiff requests that this Court grant declaratory and injunctive relief to ensure compliance with the requirements of NEPA. As stated above,

construction of the two new prisons in Elmore County and Escambia County is a major Federal action.

## JURISDICTION AND VENUE

27.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (United States as defendant); 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief); 5 U.S.C. §§ 702, 704 (APA); 42 U.S.C. §§ 4321-4370h (NEPA).

28.    This action arises under NEPA, 42 U.S.C. § 4321 et seq. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, and may issue declaratory and further relief pursuant to 28 U.S.C. § 2201 and 2202. Plaintiff is entitled to bring this action pursuant to the APA, 5 U.S.C. §§ 701-06.

29.    Venue is proper in this Court because this is a civil action brought against an agency of the United States and officers of the United States acting in their official capacities and because it is the district in which the Defendants ADOC, ACIFA and its members, Caddell, and W.S. Newell are headquartered, pursuant to 28 U.S.C. § 1391(e).

## PARTIES AND STANDING

### Plaintiff

30.    The following Plaintiffs are inmates serving sentences for criminal convictions in the custody and control of the Defendant ADOC. Defendants have arbitrarily and capriciously denied them, and all other ADOC inmates, the opportunity to participate in the NEPA process.

31.    Plaintiff Raymond Bosarge (AIS: 158686) is currently housed at Fountain Correctional Facility located at 9677 AL-21, Atmore, AL 36502. He is serving a life sentence and is currently classified as a medium security inmate. He is 69 years old. Due to Mr. Bosarge's

length of sentence, classification, and age, he is at high risk of being transferred to the Elmore Men's Prison Facility should it be built, because that facility will be equipped with medical health care units for the elderly. He will also be directly impacted by any adverse environmental impacts of the Escambia Men's Prison Facility, since he is currently housed near the site of construction, and the construction and new facility will be in the viewshed of Plaintiff.

32.     Plaintiff Brandon Carter (AIS: 261259) is currently housed at Fountain Correctional Facility located at 9677 AL-21, Atmore, AL 36502. He is serving a life sentence and is currently classified as a medium security inmate. Due to Mr. Carter's length of sentence and classification, he is at high risk of being transferred to one of the ADOC Men's Prison Facilities should they be built. He is currently housed near where the Escambia Men's Prison Facility is being constructed.

33.     Plaintiff Pat Charest (AIS: 182262) is currently housed at Fountain Correctional Facility located at 9677 AL-21, Atmore, AL 36502. He is serving a life sentence and is currently classified as a medium security inmate. Due to Mr. Carter's length of sentence and classification, he is at high risk of being transferred to one of the ADOC Men's Prison Facilities should they be built. He will also be directly impacted by any adverse environmental impacts of the Escambia Men's Prison Facility, since he is currently housed near the site of construction, and the construction and new facility will be in the viewshed of Plaintiff.

34.     Plaintiff Clifford Ellis (AIS: 208226) is currently housed at Elmore Correctional Facility located at 3520 Marion Spillway Rd., Elmore, AL 36025. He is serving a life sentence and is currently classified as a minimum-in security inmate. Due to Mr. Ellis's length of sentence and classification, he is at high risk of being transferred to one of the ADOC

Men's Prison Facilities should they be built.  He is currently housed near where the Escambia Men's Prison Facility is being constructed.

35.     Plaintiff Robert George (AIS: 176647) is currently housed at Fountain Correctional Facility located at 9677 AL-21, Atmore, AL 36502. He is serving a life sentence and is currently classified as a medium security inmate. He is 83 years old. Due to Mr. George's length of sentence, classification, and age, he is at high risk of being transferred to the Elmore Men's Prison Facility should it be built, because that facility will be equipped with medical health care units for the elderly. He will also be directly impacted by any adverse environmental impacts of the Escambia Men's Prison Facility, since he is currently housed near the site of construction, and the construction and new facility will be in the viewshed of Plaintiff.

36.     Plaintiff Justin Hicks (AIS: 280787) is currently housed at Elmore Correctional Facility located at 3520 Marion Spillway Rd., Elmore, AL 36025. He is serving a 25-year sentence and is currently classified as a minimum-in security inmate. Due to Mr. Hicks's length of sentence and classification, he is at high risk of being transferred to one of the ADOC Men's Prison Facilities should they be built. He will also be directly impacted by any adverse environmental impacts of the Elmore Men's Prison Facility, since he is currently housed near the site of construction, and the construction and new facility will be in the viewshed of Plaintiff.

37.     Plaintiff Jonathan Hill (AIS: 234918) is currently housed at Fountain Correctional Facility located at 9677 AL-21, Atmore, AL 36502. He is serving a 20-year sentence and is currently classified as a minimum security inmate. Due to Mr. Hill's length of sentence and classification, he is at high risk of being transferred to one of the ADOC Men's Prison Facilities should they be built.  He is currently housed near where the Escambia Men's Prison Facility is being constructed.

38.     Plaintiff Antwan Lambert (AIS: 279298) is currently housed at Elmore Correctional Facility located at 3520 Marion Spillway Rd., Elmore, AL 36025. He is serving a 20-year sentence and is currently classified as a minimum-in security inmate. Due to Mr. Lambert's length of sentence and classification, he is at high risk of being transferred to one of the ADOC Men's Prison Facilities should they be built. He will also be directly impacted by any adverse environmental impacts of the Elmore Men's Prison Facility, since he is currently housed near the site of construction, and the construction and new facility will be in the viewshed of Plaintiff.

39.     Plaintiff Darryl Montgomery (AIS: 201495) is currently housed at Fountain Correctional Facility located at 9677 AL-21, Atmore, AL 36502. He is serving a life sentence and is currently classified as a minimum-in security inmate. Due to Mr. Montgomery's length of sentence and classification, he is at high risk of being transferred to one of the ADOC Men's Prison Facilities should they be built. He will also be directly impacted by any adverse environmental impacts of the Escambia Men's Prison Facility, since he is currently housed near the site of construction, and the construction and new facility will be in the viewshed of Plaintiff.

40.     Plaintiff Arlando Nichols (AIS: 303975) is currently housed at Elmore Correctional Facility located at 3520 Marion Spillway Rd., Elmore, AL 36025. He is serving a life sentence and is currently classified as a medium security inmate. Due to Mr. Nichols's length of sentence and classification, he is at high risk of being transferred to one of the ADOC Men's Prison Facilities should they be built. He will also be directly impacted by any adverse environmental impacts of the Elmore Men's Prison Facility, since he is currently housed near the site of construction, and the construction and new facility will be in the viewshed of Plaintiff.

41.     Plaintiff Demetrius Poe (AIS: 279106) is currently housed at Elmore
Correctional Facility located at 3520 Marion Spillway Rd., Elmore, AL 36025. He is serving a
20-year sentence and is currently classified as a minimum-out security inmate. Due to Mr. Poe's
length of sentence and classification, he is at high risk of being transferred to one of the ADOC
Men's Prison Facilities should they be built. He will also be directly impacted by any adverse
environmental impacts of the Elmore Men's Prison Facility, since he is currently housed near the
site of construction, and the construction and new facility will be in the viewshed of Plaintiff.

42.     Plaintiff William Roache (AIS: 299754) is currently housed at Fountain
Correctional Facility located at 9677 AL-21, Atmore, AL 36502. He is serving a life sentence
and is currently classified as a medium security inmate. Due to Mr. Roache's length of sentence
and classification, he is at high risk of being transferred to one of the ADOC Men's Prison
Facilities should they be built. He will also be directly impacted by any adverse environmental
impacts of the Escambia Men's Prison Facility, since he is currently housed near the site of
construction, and the construction and new facility will be in the viewshed of Plaintiff.

43.     Plaintiff Eric Thomas (AIS: 137013) is currently housed at Elmore
Correctional Facility located at 3520 Marion Spillway Rd., Elmore, AL 36025. He is serving a
life sentence and is currently classified as a minimum-in security inmate. Due to Mr. Thomas's
length of sentence and classification, he is at high risk of being transferred to one of the ADOC
Men's Prison Facilities should they be built. He will also be directly impacted by any adverse
environmental impacts of the Elmore Men's Prison Facility, since he is currently housed near the
site of construction, and the construction and new facility will be in the viewshed of Plaintiff.

44.     Plaintiff Kenneth Traywick (AIS: 177252) is currently housed at Fountain
Correctional Facility located at 9677 AL-21, Atmore, AL 36502. He is serving a 50-year

sentence and is currently classified as a medium security inmate. Due to Mr. Traywick's length of sentence and classification, he is at high risk of being transferred to one of the ADOC Men's Prison Facilities should they be built. He will also be directly impacted by any adverse environmental impacts of the Escambia Men's Prison Facility, since he is currently housed near the site of construction, and the construction and new facility will be in the viewshed of Plaintiff.

45.     Plaintiff Willie Turner (AIS: 264598) is currently housed at Elmore Correctional Facility located at 3520 Marion Spillway Rd., Elmore, AL 36025. He is serving a 96-month sentence and is currently classified as a minimum-in security inmate. Due to Mr. Turner's length of sentence and classification, he is at high risk of being transferred to one of the ADOC Men's Prison Facilities should they be built. He will also be directly impacted by any adverse environmental impacts of the Elmore Men's Prison Facility, since he is currently housed near the site of construction, and the construction and new facility will be in the viewshed of Plaintiff.

46.     The above-listed incarcerated Plaintiffs have exhausted all administrative remedies available to them as required by the Prison Litigation Reform Act.

47.     Plaintiff Rodney Lee Lindsay is a resident of Wetumpka in Elmore County, Alabama, the town adjacent to unincorporated Elmore where the Elmore Men's Prison Facility is slated to be built. Mr. Lindsay lives and spends most of his time a short distance from the proposed location of the Elmore Men's Prison Facility. Mr. Lindsay uses and enjoys wildlife trails in Elmore, Alabama, and the Tallapoosa and Coosa Rivers for recreation, including but not limited to kayaking, fishing, wildlife observation, nature and landscape observation and aesthetic enjoyment. It is reasonably probable that the construction of the Elmore Men's Prison Facility, will alter the quality of the environment and diminish the Plaintiff's recreational and aesthetic

enjoyment of the area. The Elmore Men's Prison Facility will be located in the sparsely populated unincorporated town of Elmore with approximately 1,400 individuals (plus the current incarcerated population of 1,400 at Staton Correctional Facility and approximately 1,150 at Elmore Correctional Facility). It is set to have a 4,000-bed capacity, and the State of Alabama has admitted that the ADOC Men's Prison Facilities will be overcrowded by approximately 150% when the facilities open, the population of this rural town will increase by approximately 6,000 individuals – a 150% increase over its current population. The additional strain that this capacity will put on the surrounding environment and natural resources through waste disposal, water extraction, wastewater treatment, nighttime lighting and other unstudied environmental impacts is very likely to permanently alter the landscape of the area that Mr. Lindsay enjoys for recreational and aesthetic activities.

## **Defendants**

48.     Defendants Janet Yellen and United States Department of Treasury are responsible for overseeing NEPA analyses and for ensuring that all analyses complied with NEPA. These Defendants have a responsibility to ensure that all projects over which they exercise sufficient control or responsibility comply with the Federal regulations outlined in NEPA. Given Defendant's direct oversight and distribution of ARPA funds, including by providing ongoing guidance on acceptable projects, they are the entity tasked with enforcing critical environmental compliance for projects such as the ADOC Men's Prison Facilities, including by demanding that the entities who are financing and constructing the facilities conduct an environmental assessment or environmental impact statement before the construction project is initiated.

49.     Defendant ADOC is an agency of the State of Alabama. ADOC is responsible for complying with NEPA before proceeding with projects which involve major federal action. The stated mission of ADOC is "dedicated professionals providing public safety through the safe and secure confinement, rehabilitation, and successful re-entry of offenders," and its vision is "impacting lives for a safer Alabama." Defendant ADOC is responsible for the safe housing and care of all inmates within its custody.

50.     Kay E. Ivey is the ACIFA President and the Governor of the State of Alabama. Governor Ivey and all members of ACIFA had the final authority for the State's decision to proceed with the challenged project despite this inadequate environmental analysis. Defendant's responsibilities include making NEPA-related decisions and the siting of future ADOC facilities. Governor Ivey is sued in her official capacity.

51.     John Hamm is an ACIFA Member & Vice President and Commissioner of ADOC. Mr. Hamm and all members of ACIFA had the final authority for the State's decision to proceed with the challenged project despite this inadequate environmental analysis. Defendant's responsibilities include making NEPA-related decisions and the siting of future ADOC facilities. Mr. Hamm is sued in his official capacity.

52.     Bill Poole is the ACIFA Secretary and the State Director of Finance. Mr. Poole and all members of ACIFA had the final authority for the State's decision to proceed with the challenged project despite this inadequate environmental analysis. Defendant's responsibilities include making NEPA-related decisions and the siting of future ADOC facilities. Mr. Poole is sued in his official capacity.

53.     Steve Clouse is an ACIFA Member and Chair of the House Ways and Means General Fund Committee of the Alabama House of Representatives. Representative

Clouse and all members of ACIFA had the final authority for the State's decision to proceed with the challenged project despite this inadequate environmental analysis. Defendant's responsibilities include making NEPA-related decisions and the siting of future ADOC facilities. Representative Clouse is sued in his official capacity.

54.     Greg Albritton is an ACIFA Member and Chair of the Senate Finance and Taxation General Fund Committee of the Alabama Senate. Senator Albritton and all members of ACIFA had the final authority for the State's decision to proceed with the challenged project despite this inadequate environmental analysis. Defendant's responsibilities include making NEPA-related decisions and the siting of future ADOC facilities. Senator Albritton is sued in his official capacity.

55.     Senator Bobby Singleton is an ACIFA Member and Senate Minority Leader of the Alabama Senate. Senator Singleton and all members of ACIFA had the final authority for the State's decision to proceed with the challenged project despite this inadequate environmental analysis. Defendant's responsibilities include making NEPA-related decisions and the siting of future ADOC facilities. Senator Singleton is sued in his official capacity.

56.     Cam Ward is an ACIFA Member and Director of the Bureau of Pardons and Paroles of the State of Alabama. Mr. Ward and all members of ACIFA had the final authority for the State's decision to proceed with the challenged project despite this inadequate environmental analysis. Defendant's responsibilities include making NEPA-related decisions and the siting of future ADOC facilities. Mr. Ward is sued in his official capacity.

57.     Young Boozer is the ACIFA Non-Member Treasurer and Treasurer of the State of Alabama. Mr. Boozer and all members of ACIFA had the final authority for the State's decision to proceed with the challenged project despite this inadequate environmental analysis.

Defendant's responsibilities include making NEPA-related decisions and the siting of future ADOC facilities. Mr. Boozer is sued in his official capacity.

58.     Caddell is a foreign limited liability company formed in Delaware. Caddell is headquartered at 445 Dexter Avenue, Suite 11000, Montgomery, AL 36104. Under the laws of the State of Alabama, Caddell is a person within the meaning of *Ala. Code* § 22-22-1(b)(7) (2006 Rplc. Vol.). Caddell entered into a Design-Build Contract with ACIFA dated April 15th, 2022 for the construction of the Elmore Men's Prison Facility. Under Article 8 of the Design-Build Contract, Caddell is responsible for complying with all permits, authorizations and registrations related to environmental compliance of the Elmore Men's Prison Facility construction project. As of the date of this Complaint, Defendants ADOC and ACIFA have paid Caddell $8,958,515.07 for construction costs associated with the Elmore Men's Prison Facility.

59.     W.S. Newell is a domestic corporation formed in Montgomery County, Alabama. W.S. Newell is headquartered at 10480 Highway 80 East, Montgomery, AL 36117. Under the laws of the State of Alabama, Caddell is a person within the meaning of *Ala. Code* § 22-22-1(b)(7) (2006 Rplc. Vol.). W.S. Newell has been engaged by the state of Alabama to prepare the Elmore Men's Prison Facility site for construction. As of the date of this Complaint, Defendants ADOC and ACIFA have paid W.S. Newell $4,156,962.50 for construction costs associated with the Elmore Men's Prison Facility.

## LEGAL BACKGROUND

### A.     NEPA

60.     NEPA, 42 U.S.C. §§ 4321–4370f, is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It makes environmental protection a part of the mandate of every federal agency. 42 U.S.C. § 4332(1).

61.     NEPA requires agencies to prepare an Environmental Assessment ("EA") or an Environmental Impact Statement ("EIS") before undertaking a major federal action that will significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C).

62.     The "human environment" to be analyzed "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. . . . When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment." 40 C.F.R. § 1508.14.

63.     The EA or EIS serves three primary functions. First, it ensures that an agency takes a hard look at the direct, indirect and cumulative environmental impacts of a proposed project. 40 C.F.R. § 1508.25(c). Second, it guarantees that the agency considers a range of reasonable alternatives to accomplish the underlying goals of the proposed project and considers options that may have fewer adverse impacts on the environment before deciding whether to undertake the project in the form proposed. Finally, the EA or EIS presents detailed information about a proposed project, its impacts, and reasonable alternatives, to the public and other agencies, so that they may participate in the decision-making process.

64.     To implement the requirements of NEPA, the Council on Environmental Quality ("CEQ") has promulgated regulations applicable to all federal agencies. *See* 40 C.F.R. § § 15001508 ("the CEQ regulations").

65.     NEPA requires that every EA or EIS must be prepared with objective good faith and must fully and fairly discuss, among other things, the adverse environmental effects of

the proposed action and the alternatives to the proposed action which may avoid or minimize these adverse effects. 42 U.S.C. § 4332(2)(C), (E).

66.     The "effects" that must be discussed in an EIS include, among other considerations, the direct environmental impacts of the proposed action, the indirect effects of the proposed action, and the cumulative impacts of the proposed action. 40 C.F.R. § 1502.16 (a) - (h); 40 C.F.R. § 1508.27(b)(7).

67.     NEPA regulations define "indirect effects" as effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Further, indirect effects may include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b).

68.     The NEPA regulations define "cumulative impact" as the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

69.     Executive Order 12,898 also requires federal agencies to include an environmental justice analysis in their NEPA reviews. Like other components of an EA or EIS, an environmental justice analysis must be "reasonable and adequately explained," *See Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689, 359 U.S. App. D.C. 383 (D.C. Cir. 2004).

70.     NEPA also "guarantees that the relevant information [concerning environmental impacts] will be made available to the larger audience," including the public, "that may also play a role in the decision making process and the implementation of the decision." *Id.* NEPA's implementing regulations require federal agencies to "invite the participation" of "interested persons" during its scoping process. 40 C.F.R. § 1501.7(a)(1).

71.     NEPA requires agencies to fully disclose all of the potential adverse environmental impacts of its decisions before deciding to proceed. 42 U.S.C. § 4332(C). NEPA also requires agencies to use high quality, accurate scientific information and to ensure the scientific integrity of the analysis. 40 C.F.R. §§ 1500.1(b), 1502.24.

72.     After preparing an EA or EIS, but before finalizing an EA or EIS, the federal agency is legally required to "request comments from the public" and must affirmatively solicit "comments from those persons or organizations who may be interested or affected." 40 C.F.R. § 1503.1(a)(2)-(4).

73.     Additionally, CEQ Regulations require that whenever "significant new …information relevant to environmental concerns and bearing on the proposed action or its impacts" comes to light, agencies are required to update and supplement a previously issued EA or EIS. 40 C.F.R. § 1502.9(c)(1)(ii). The Supreme Court has interpreted these regulations to "impose a duty" on an agency to take such action whenever it is made aware of such new information. *Marsh* v. *Ore. Natural Res. Counc.*, 490 U.S. 360, 372 (1989).

**B.      APA**

74.     The APA confers a right of judicial review on any person that is adversely affected by agency action. *See* 5. U.S.C. § 702. The APA provides that the reviewing court "shall…hold unlawful and set aside agency action, findings, and conclusions found to be []

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id., §
706(2)(A).

75.     Defendants' actions in engaging in site preparation for the ADOC Men's
Prison Facilities and other activities in anticipation of construction are "agency actions" subject
to judicial review under the APA.

## FACTS GIVING RISE TO LEGAL CLAIMS

### Project History

**A.     *Legislative and Administrative History***

76.     On October 1, 2021, during the First Special Session of 2021, the
Alabama State Legislature approved a package of bills containing plans for the construction and
financing of two prisons in Elmore and Escambia counties. Defendant Governor Kay Ivey signed
these bills into law on the same day. The two pertinent bills that were signed into law are HB4
and HB5.

77.     HB4 created a three-phase plan for overhauling the physical infrastructure
of ADOC. The bill provided authorization for ACIFA to issue bonds, not to exceed $785 million,
for the three-phase plan.

78.     Phase One of the plan initiated the construction of two 4,000-bed prisons,
one each in Elmore and Escambia counties. Upon the completion of both new facilities, three
existing facilities (Staton Correctional Facility, Elmore Correctional Facility, and Kilby
Correctional Facility) shall be closed within one year. A fourth existing facility (St. Clair
Correctional Facility) shall also be closed after the completion of the two new facilities at a time
to be determined by the ADOC.

79.     Phase Two of the plan lays out that after 60 percent of the completion of Phase One, the ADOC can proceed with plans to construct a new 1,000-bed facility for incarcerating women, which would replace Alabama's only existing facility for women (Julia Tutwiler Prison) within one year of completion. Phase Two also provides for existing ADOC facilities in Jefferson and Limestone counties (Donaldson and Limestone Correctional Facilities, respectively) to be renovated, improved, or if necessary, demolished and reconstructed. A third existing facility in either Barbour or Bullock county (Ventress or Bullock Correctional Facilities, respectively) will also be renovated, improved, or demolished and reconstructed, with facility selection yet to be determined by the ADOC.

80.     Phase Three of the plan provides that prior to the completion of 75% of Phase Two, the ADOC will re-evaluate the needs of Alabama's prison system for men to see if further prison beds are needed. The evaluation will provide particular attention to Bibb Correctional Facility and the potential for repurposing it.

81.     HB5 authorized the use of $400M in ARPA funds for funding the construction of the two Phase One prisons initiated by the passage of HB4. Specifically, the bill made "a supplemental appropriation of federal funds from the The American Rescue Plan Act - Coronavirus State Fiscal Recovery Revenue Replacement Fund to the Department of Corrections - Correctional Capital Improvement Fund in the amount of $400,000,000 for the fiscal year ending September 8 30, 2022."

82.     Between October and December of 2021, numerous concerned parties in Alabama and across the country made public comments to the Defendant Treasury concerning Alabama's planned use of ARPA funds to construct prisons.

83.     On January 27, 2022, Defendant Treasury published their Final Rule on Coronavirus State and Local Fiscal Recovery Funds. In the overview of the Final Rule, it reads that "Treasury presumes that the following capital projects are generally eligible: construction of new correctional facilities as a response to an increase in rate of crime; construction of new congregate facilities to decrease spread of COVID-19 in the facility."

84.     On April 15, 2022, the ACIFA signed a contract with Caddell to build a 4,000-bed prison in Elmore County.

85.     On June 8, 2022, it was first reported that site preparation had begun for construction of the Elmore County Men's Prison. Elmore County Commissioner Troy Stubbs stated that "a lot of prep work" was being done onsite.

86.     On June 28, 2022, the State of Alabama placed a $725 million bond on the market to fund prison construction. The bond only attracted $509 million in investment. Closing for the bond is expected on July 12, 2022.

87.     On June 30, 2022, ACIFA held a public meeting and stated that the State plans to move forward with the exact same construction plan on the exact same timetable. At the meeting, Defendant Poole stated that the shortfall of more than $200 million would not affect the scale of the State's prison construction plan or the construction timeline. He stated that Alabama does not currently have a plan for how they will find additional funds, suggesting only that the Alabama State Legislature might be asked to appropriate the funds at a later date, or that an additional bond might be issued at a later date. At the meeting, Poole also stated that site prep work for construction has already begun at both the Elmore and Escambia county construction locations. Below are images showing the extensive development that has already occurred at the Elmore Men's Prison Facility.





88.    To date, no construction contracts have yet been signed for the Escambia County site where prep work has already begun, according to Defendant Poole's statements.

**B.    *Elmore***

89.    According to the Center for Biological Diversity, construction of dams on the Coosa River in the 20th century caused the greatest extinction event in modern North American history. Elmore County is home to at least 25 aquatic and terrestrial species identified

by the U.S. Fish and Wildlife Service (USFWS) as Threatened or Endangered, including mollusks, plants and birds as well as two rare species of bats that are currently under review. Despite previous threats to the local environment and waterways, the Coosa River and associated tributaries and impoundments support a significant economic contribution to the region from outdoor recreation and provision of natural resources. In April 2022, American Rivers included the Coosa River on their list of the nation's most endangered rivers for the third time since 1999. The proposed location of the Elmore Men's Prison Facility is sited near the tailwaters of the Coosa River. Wastewater from the facility will be discharged to a creek tributary to the tailwaters of the Coosa River, where existing prison facilities also currently are discharged. The Coosa River in turn joins the Tallapoosa River near Wetumpka, Alabama, approximately 14 miles above Montgomery, Alabama, to form the Alabama River. The Alabama River is critical habitat for the Alabama Sturgeon, an endangered species of fish.

## Elmore Prison Vicinity



7/10/2022

| | | | |
|---|---|---|---|
| Streams | Places of Worship | Water dischargers | |
| Water Bodies | Prisons | Hazardous waste | |

1:36,112

0    0.25    0.5         1 mi
0    0.4     0.8         1.6 km

EPA, OMS, Esri, HERE, Garmin, SafeGraph, GeoTechnologies, Inc, METI/
NASA, USGS, EPA, NPS, US Census Bureau, USDA



### C.    Escambia

90.      Escambia County includes habitat for the Eastern indigo snake, a federally-listed
threatened species which had become so rare in the 1950s that attempts to reintroduce it have
been undertaken by conservationists and state agencies. For six decades, there was not a single
recorded observation of a wild-bred Eastern indigo snake anywhere in Alabama, but one was
finally located in Escambia County in 2020. The Eastern indigo snake is not alone: habitat for at
least 19 Threatened and Endangered Species occurs in Escambia County. Species of concern per
the United States Fish and Wildlife Service include mollusks, fishes, plants and birds, two rare
species of bat, and the alligator snapping turtle. Wastewater and other potential emissions and
site disturbances caused by the proposed facility must be evaluated for impacts to surrounding
environmental and cultural resources.

Escambia Prison Vicinity



7/10/2022

- - - - Streams

▢ Water dischargers

▨ Prisons

▢ Water Bodies

▢ Hazardous waste

1:36,112

0    0.25    0.5         1 mi

0    0.42    0.85        1.7 km

EPA, OAPI, COLANP, Esri, HERE, Garmin, SafeGraph, GeoTechnologies, Inc, METI/NASA, USGS, EPA, NPS, US Census Bureau, USDA



## CLAIM FOR RELIEF

### Defendants' Failure to Conduct an Environmental Impact Statement for the ADOC Men's Prison Facilities Violates NEPA and APA

91.     The above paragraphs are incorporated herein by reference.

92.     NEPA requires the preparation of an environmental assessment when the proposed action is not categorically excluded from the requirements to prepare an environmental assessment and environmental impact statement. 40 C.F.R. §§ 1501.3(a), 1501.4. *See also* 40 C.F.R. § 1508.4.

93.     NEPA also requires all environmental studies to take a hard look at a project's direct, indirect, and cumulative impacts. City of *Oxford* v. *F.A.A.*, 428 F.3d 1346, 1352 (11th Cir. 2005).

94.     NEPA requires the analysis of all environmental impacts and alternatives before actions are taken on the ground. 42 U.S.C. § 4332(2)(C),(E). Otherwise, NEPA is reduced

to an empty exercise that contains only post-hoc justifications for projects and deprives agencies and the public of the right to understand all impacts before projects move forward. *Id.*

95.    Despite this statement, and in open defiance of NEPA, Defendants ADOC, ACIFA and its members have been engaged in construction-related activities and have appropriated funds for the construction.

96.    Defendant Treasury has failed to enforce compliance with NEPA. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See 5 U.S.C. § 706(2)(A).

97.    Defendants are improperly moving ahead with work on the ADOC Men's Prison Facilities before complying with NEPA, and Defendant Treasury's failure to enforce the law violates APA.

98.    Defendants' ongoing activities and/or failure to intervene is such activities at the ADOC Men's Prison Facilities violate NEPA and its implementing regulations, and are arbitrary, capricious, and otherwise contrary to law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1.    Enter a declaratory judgment that the Defendants have violated the National Environmental Policy Act by failing to prepare an Environmental Assessment or comprehensive Environmental Impact Statement for the ADOC Men's Prison Facilities;

2.    Enter appropriate preliminary and permanent injunctive relief to ensure that Defendants comply with the National Environmental Policy Act, and specifically to ensure that Defendants take no further actions toward proceeding with the ADOC Men's Prison Facilities until they have prepared an EA or EIS in compliance with NEPA;

3.      Award Plaintiff the costs of this action, including its reasonable attorneys' fees; and

4.      Grant such other relief as the Court deems just and proper.

Respectfully submitted this 11th of July, 2022.

K. David Sawyer
McPhillips Shinbaum, LLP
516 South Perry Street
Montgomery, AL  36104
T: (334) 262-1911
F: (334) 263-2321
kdsawyer64@outlook.com

**EXHIBIT 1**

## CONFLICT DISCLOSURE STATEMENT

COMES NOW Plaintiffs in the above-captioned matter, and in accordance with the order of this Court, making the following disclosures concerning parents companies, subsidiaries, partners, limited liability entity members and managers, trustee (but not trust beneficiaries), affiliates, or similar entities reportable under the provisions of the Middle District of Alabama's General Order No. 3047:

☒  All Plaintiffs are individuals, or

☐  This party is a governmental entity, or

☐  There is no entities to be reported, or

☐  The following entities and their relationship to the party are here by reported

7/11/2022
_____
Date

_____
Counsel Signature

K. David Sawyer
McPhillips Shinbaum, LLP
516 South Perry Street
Montgomery, AL  36104
T: (334) 262-1911
F: (334) 263-2321
kdsawyer64@outlook.com

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

**CERTIFICATE OF SERVICE**

I, <u>David Sawyer</u>,  do hereby certify that a true and correct copy of the foregoing has been furnished by certified mail on this 11th day of July 2022, to:

Governor Kay E. Ivey
600 Dexter Avenue
Montgomery, AL 36130

John Hamm
Commissioner
Alabama Department of Corrections
301 S. Ripley Street
P.O. Box 301501
Montgomery, AL 36130-1501

Bill Poole
Director
Department of Finance
Accounting and Administration
P.O. Box 300658
Montgomery, AL 36130-0658

Representative Steve Clouse
11 South Union Street
Suite 410-D
Montgomery AL 36130

Senator Greg Albritton
Alabama State Senate
11 South Union Street
Room 727
Montgomery, AL 36130

Senator Bobby Singleton
Alabama State Senate
11 South Union Street
Suite 740
Montgomery, AL

Cam Ward
Director
100 Capitol Commerce Blvd.
Suite 310
Montgomery, AL 36117

Young Boozer
Executive Office of the Treasurer
600 Dexter Avenue, Room S-106
Montgomery, Alabama 36104

Steven T. Marshall
Attorney General
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130

Janet L. Yellen
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220


Merrick Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Eddie Stewart
Chairman / CEO
Caddell Construction Co. (DE), LLC
445 Dexter Ave Suite 11000
Montgomery, AL 36104


Sam Newell
President
W.S. Newell & Sons, Inc.
10480 Highway 80 East
Montgomery, AL 36117


___7/11/2022___

Date

_David Sawyer_

Signature